UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

CASE NO. 6:19-cr-

v.

18 U.S.C. § 371
18 U.S.C. § 1349
18 U.S.C. § 1347
42 U.S.C. § 1320a-7b(b)(1)(A)

IVAN ANDRE SCOTT

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times material to this Indictment:

### A. **The Medicare Program**

1.     The Medicare Program ("Medicare") was a federally funded program

that provided free or below-cost health care benefits to certain individuals,

primarily the elderly, blind, and disabled. The benefits available under

Medicare were governed by federal statutes and regulations. The United States

Department of Health and Human Services ("HHS"), through its agency, the

Centers for Medicare and Medicaid Services ("CMS"), oversaw and

administered Medicare. Individuals who received benefits under Medicare

were commonly referred to as Medicare "beneficiaries."

2.     Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b) and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3.     Medicare programs covering different types of benefits were separated into different program "parts." "Part A" of the Medicare program covered health services provided by hospitals, skilled nursing facilities, hospices and home health agencies. "Part B" of the Medicare Program was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

4.     Physicians, clinics and other health care providers, including laboratories, which provided services to Medicare beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

5.     A Medicare claim was required to contain certain important information, including: (a) the Medicare beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care

2

benefit, item, or service that was provided or supplied to the beneficiary; (c)

the billing codes for the benefit, item, or service; (d) the date upon which the

benefit, item, or service was provided or supplied to the beneficiary; and (e)

the name of the referring physician or other health care provider, as well as a

unique identifying number, known either as the Unique Physician

Identification Number ("UPIN") or National Provider Identifier ("NPI").

The claim form could be submitted in hard copy or electronically.

### Part B Coverage and Regulations

6.      CMS acted through fiscal agents called Medicare administrative

contractors ("MACs"), which were statutory agents for CMS for Medicare

Part B. The MACs were private entities that reviewed claims and made

payments to providers for services rendered to Medicare beneficiaries. The

MACs were responsible for processing Medicare claims arising within their

assigned geographical area, including determining whether the claim was for a

covered service.

7.      Novitas Solutions Inc. ("Novitas") was the MAC for consolidated

Medicare jurisdictions JH and JL, which included Louisiana, Mississippi,

Oklahoma, Texas, and Pennsylvania.

8.      To receive Medicare reimbursement, providers had to make appropriate

application to the MAC and executed a written provider agreement. The

Medicare provider enrollment application, CMS Form 855A, was required to

be signed by an authorized representative of the provider. CMS Form 855A

contained a certification that stated:

> I agree to abide by the Medicare laws, regulations,
> and program instructions that apply to this provider.
> The Medicare laws, regulations, and program
> instructions are available through the Medicare
> contractor. I understand that payment of a claim by
> Medicare is conditioned upon the claim and the
> underlying transaction complying with such laws,
> regulations and program instructions (including, but
> not limited to, the federal anti-kickback statute and
> the Stark law), and on the provider's compliance
> with all applicable conditions of participation in
> Medicare.

9.     CMS Form 855A contained additional certifications that the provider

"will not knowingly present or cause to be presented a false or fraudulent

claim for payment by Medicare and will not submit claims with deliberate

ignorance or reckless disregard of their truth or falsity."

10.     Payments under Medicare Part B were often made directly to the health

care provider rather than to the patient or beneficiary. For this to occur, the

beneficiary would assign the right of payment to the health care provider.

Once such an assignment took place, the health care provider would assume

the responsibility for submitting claims to, and receiving payments from,

Medicare.

### Cancer Genetic Tests

11.     Cancer genetic ("CGx") testing used DNA sequencing to detect

mutations in genes that could indicate a higher risk of developing certain types

of cancers in the future. CGx testing was not a method of diagnosing whether

an individual presently had cancer.

*12.*     Medicare did not cover diagnostic testing that was "not reasonable and

necessary for the diagnosis or treatment of illness or injury or to improve the

functioning of a malformed body member." Title 42, United States Code,

Section 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did

not cover "examinations performed for a purpose other than treatment or

diagnosis of a specific illness, symptoms, complaint or injury." Title 42, Code

of Federal Regulations, Section 411.15(a)(1). Among the statutory exceptions

Medicare covered were cancer screening tests such as "screening

mammography, colorectal cancer screening tests, screening pelvic exams,

[and] prostate cancer screening tests." *Id.*

13.     If diagnostic testing were necessary for the diagnosis or treatment of

illness or injury or to improve the functioning of a malformed body member,

Medicare imposed additional requirements before covering the testing. Title

42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic

x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be

ordered by the physician who is treating the beneficiary, that is, the physician

who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

14.     Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

### Telemedicine

15.     Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to interact with a patient.

16.     Telemedicine companies provided telemedicine services to individuals by hiring doctors and other health care providers. Telemedicine companies typically paid doctors a fee to conduct consultations with patients. In order to generate revenue, telemedicine companies typically either billed insurance or received payment from patients who utilized the services of the telemedicine company.

17.     Medicare Part B covered expenses for specified telehealth services if certain requirements were met.  These requirements included that (a) the

beneficiary was located in a rural or health professional shortage area; (b)

services were delivered via an interactive audio and video telecommunications

system; and (c) the beneficiary was a practitioner's office or a specified

medical facility – not at a beneficiary's home – during the telehealth

consultation with a remote practitioner.

### B. **The Defendant and Relevant Entities**

18.     IVAN ANDRE SCOTT was a resident of Osceola County in the

Middle District of Florida and was the owner and registered agent of Scott

Global, LLC (Scott Global). Scott Global was a Florida corporation that did

business in Orange County, Florida. Scott Global was located at 14 East

Washington St., Suite 406, Orlando, FL 32801.

### COUNT ONE
### Conspiracy to Commit Health Care Fraud
### 18 U.S.C. 1349

1.     Paragraphs 1 through 26 of the General Allegations section of this

Indictment are re-alleged and incorporated by reference as though fully set

forth herein.

### The Conspiracy

2.     Beginning in or around November 2018 and continuing through in or

around May 2019, in the Middle District of Florida, and elsewhere, the

defendant,

7

## IVAN ANDRE SCOTT

did willfully and knowingly combine, conspire, confederate, and agree with

each other and others known and unknown to the Grand Jury, to commit

certain offenses against the United States, that is:

> a. to knowingly and willfully execute a scheme and artifice to
>
> defraud a health care benefit program affecting commerce, as
>
> defined in 18 U.S.C. § 24(b), that is, Medicare, and to obtain
>
> by means of materially false and fraudulent pretenses,
>
> representations and promises, money and property owned by,
>
> and under the custody and control of, said health care benefit
>
> program, in connection with the delivery and payment for
>
> health care benefits, items, and services in violation of 18
>
> U.S.C. § 1347.

### Purpose of the Conspiracy

3.    It was the purpose of the conspiracy for the defendant and his co-

conspirators to unlawfully enrich themselves by, among other things: (a)

causing the submission of false and fraudulent claims to Medicare for genetic

testing that was medically unnecessary and not eligible for reimbursement; (b)

diverting fraud proceeds for the personal use and benefit of themselves and

others, and to further the fraud; and (c) concealing the submission of false and

fraudulent claims to Medicare and the receipt and the receipt and transfer of fraud proceeds.

## Manner and Means of the Conspiracy

4.     The manner and means by which the defendant and his co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things, the following:

      a.  It was part of the conspiracy that IVAN ANDRE SCOTT did create and control Scott Global.

      b.  It was part of the conspiracy that IVAN ANDRE SCOTT and his co-conspirators would operate Scott Global to identify Medicare beneficiaries and obtain their medical histories.

      c.  It was part of the conspiracy that IVAN ANDRE SCOTT and his co-conspirators would inform the Medicare beneficiaries that they were eligible for genetic testing and send the Medicare beneficiaries genetic testing kits so that the Medicare beneficiaries could self-administer a genetic testing swab.

      d.  It was part of the conspiracy that IVAN ANDRE SCOTT and his co-conspirators would then receive the completed genetic testing kits and cause those to be sent to laboratories.

e. It was part of the conspiracy that IVAN ANDRE SCOTT and his co-conspirators would an did cause the submission of claims to Medicare via interstate wires, that falsely and fraudulently represented health care benefits, primarily that genetic testing was medically necessary and validly prescribed by a doctor.

f. It was part of the conspiracy that IVAN ANDRE SCOTT and his co-conspirators caused Medicare to make payments on claims for health care services that were medically unnecessary.

g. It was part of the conspiracy that IVAN ANDRE SCOTT and his co-conspirators would receive kickback payments in exchange for sourcing Medicare beneficiaries and procuring genetic testing kits from Medicare beneficiaries.

h. It was part of the conspiracy that IVAN ANDRE SCOTT and his co-conspirators would and did falsify, alter, or attempt to falsify or alter invoices to disguise and conceal the fact that they were paid a kickback on a per Medicare beneficiary basis.

i. It was part of the conspiracy that as a result of such false and fraudulent claims, Scott Global was paid $194,473.10 as kickbacks.

j. It was part of the conspiracy that the conspirators would and did perform acts and make statements to hide and conceal, and cause to be hidden and concealed, the purpose of the conspiracy and the acts committed in furtherance thereof.

All in violation of 18 U.S.C. § 1349.

## COUNTS TWO THROUGH FOUR
### Health Care Fraud
### 18 U.S.C. § 1347

5. Paragraphs 1 through 26 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

### The Scheme and Artifice

Beginning in or around November 2018 and continuing through in or around May 2019, in the Middle District of Florida and elsewhere, the Defendant,

### IVAN ANDRE SCOTT,

in connection with the delivery and payment for health care benefits, items, and services, did knowingly and willfully, execute, and attempt to execute, a

11

scheme and artifice to defraud a health care benefit program affecting

commerce as defined by 18 U.S.C. 24(b), that is, Medicare, and to obtain by

means of materially false and fraudulent pretenses, representations, and

promises, money and property owned by, and under the custody and control

of, said healthcare benefit program.

### Purpose of the Scheme and Artifice

6.      It was the purpose of the scheme and artifice for the Defendant and

others to unlawfully enrich themselves by, among other things: (a) causing the

submission of false and fraudulent claims to Medicare for genetic testing that

was medically unnecessary and not eligible for reimbursement; (b) diverting

fraud proceed for the personal use and benefit of themselves and others, and to

further the fraud; and (c) concealing the submission of false and fraudulent

claims to Medicare and the receipt and the receipt and transfer of fraud

proceeds.

### Manner and Means of the Scheme and Artifice

7.      The allegations contained in paragraphs 4a through 4j of the Manner

and Means section of Count One of this indictment are re-alleged and

incorporated by reference as though fully set forth herein.

**Execution or Attempted Execution of the Scheme and Artifice**

8.     On or about the dates set forth as to each count below, in the Middle

District of Florida, and elsewhere, the defendant, IVAN ANDRE SCOTT, in

connection with the delivery and payment for health care benefits, items, and

services, did knowingly and willfully execute, and attempt to execute, the

above-described scheme and artifice to defraud a health care benefit program

affecting commerce, as defined in 18 U.S.C. § 24(b), that is Medicare, and to

obtain by means of materially false and fraudulent pretenses, representations,

and promises, money and property owned by, and under the custody and

control of said health care benefit program, in that they submitted and caused

the submission of false and fraudulent Medicare claims seeking

reimbursement for the cost of genetic testing that was not medically necessary.

| Count | Medicare Beneficiary Initials | Approx. Date of Service of Claim | Claim Number | CGx Test Billed; Approx. Billed Amount (Total Claims) |
|---|---|---|---|---|
| TWO | K.B. | May 3, 2019 | 871819123441930 | Gene Analysis (colon cancer); $12,601.24 |
| THREE | C.B. | April 5, 2019 | 452919095501390 | Gene Analysis (colon cancer); $12,601.24 |
| FOUR | L.W | March 13, 2019 | 452919072153060 | Gene Analysis (colon cancer); $22,724.26 |

All in violation of 18 U.S.C. § 1347.

## COUNT FIVE
### Conspiracy to Defraud the United States and Pay and Receive Health Care Kickbacks
### 18 U.S.C. § 371

9.      Paragraphs 1 through 26 of the General Allegations section of this

Indictment are re-alleged and incorporated by reference as though fully set

forth herein.

## The Conspiracy

10.     Beginning in or around November 2018 and continuing through in or around May 2019, in the Middle District of Florida, and elsewhere, the defendant,

### IVAN ANDRE SCOTT,

did willfully and knowingly combine, conspire, confederate, and agree with others known and unknown to the Grand Jury:

      a.  to defraud the United States by impairing, impeding, obstructing and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services, in its administration and oversight of the Medicare program; and

      b.  to commit offenses against the United States:

           i.  soliciting and receiving remuneration, in violation of 42 U.S.C. § 1320a-7b(b)(1); and

          ii.  offering and paying remuneration, in violation of 42 U.S.C. § 1320a-7b(b)(2).

### Purpose of the Conspiracy

11.     It was the purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) offering, paying, soliciting, and receiving kickbacks and bribes in return for referring Medicare beneficiaries for genetic testing; and (b) causing the

submission of claims to Medicare for genetic testing that were medically unnecessary.

## Manner and Means of the Conspiracy

12.    The manner and means by which the defendant and his co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things, the following:

    a.  It was part of the conspiracy that IVAN ANDRE SCOTT did create and control Scott Global.

    b.  It was further part of the conspiracy that IVAN ANDRE SCOTT, through Scott Global, would and did solicit and receive payment in the form of illegal kickbacks and bribes in exchange for referring Medicare beneficiaries for genetic testing.

    c.  It was further part of the conspiracy, that IVAN ANDRE SCOTT and others in Scott Global would and did transmit Medicare beneficiary information for genetic testing that was medically unnecessary.

    d.  It was further part of the conspiracy that IVAN ANDRE SCOTT, through Scott Global would and did pay health care providers, for ordering or prescribing genetic testing for Medicare beneficiaries without consulting with the primary

care providers for the Medicare beneficiaries and regardless of medical necessity.

e.  It was further part of the conspiracy that IVAN ANDRE SCOTT and others in Scott Global would and did transfer Medicare beneficiary medical information in exchange for payment in the form of kickbacks and bribes, understanding that the information would be used to support false and fraudulent Medicare claims.

f.  It was further part of the conspiracy that IVAN ANDRE SCOTT and others would and did disguise and conceal the nature and source of the kickbacks and bribes by, among other conduct, creating and maintaining fraudulent invoices identifying services rendered as client review, consultations, data entry, evaluations and/or marketing.

g.  It was further part of the conspiracy that IVAN ANDRE SCOTT and others would and did facilitate the submission of false and fraudulent claims to Medicare totaling approximately $2,887,018.44 for genetic testing that were ineligible for Medicare reimbursement because they were

procured through payment of illegal kickbacks and bribes
and/or medically unnecessary.

h.  It was further part of the conspiracy that IVAN ANDRE
SCOTT and his co-conspirators did participate in meetings,
perform various acts, and make statements to accomplish the
objects of the conspiracy and to conceal the conspiracy.

### Overt Acts

13.     In furtherance of the conspiracy, and to accomplish its object and
purpose, at least one co-conspirator committed and caused to be committed,
in the Middle District of Florida, at least one of the following overt acts,
among others:

a.  On or about November 30, 2018, IVAN ANDRE SCOTT,
through Scott Global, caused the transmission of a false and
fraudulent invoice in the amount of $8,000 in order to obtain
payment in the form of illegal kickbacks or bribes.

b.  On or about December 21, 2018, IVAN ANDRE SCOTT,
through Scott Global, caused the transmission of a false and
fraudulent invoice in the amount of $4,500 in order to obtain
payment in the form of illegal kickbacks or bribes.

c.  On or about December 28, 2018, IVAN ANDRE SCOTT,
through Scott Global, caused the transmission of a false and

fraudulent invoice in the amount of $6,000 in order to obtain

payment in the form of illegal kickbacks or bribes.

All in violation of 18 U.S.C. § 371.

## COUNTS SIX THROUGH EIGHT
**Receipt of Kickbacks in Connection with a Federal Health Care Program
42.S.C. § 1320-a7b(b)(1)(A))**

1.      Paragraphs 1 through 26 of the General Allegations section of this
Indictment are re-alleged and incorporated by reference as though fully set
forth herein.

2.      On or about the dates set forth below in each count, in the Middle
District of Florida, and elsewhere, the Defendant,

### IVAN ANDRE SCOTT,

acting in concert with others, did knowingly and willfully solicit and receive
and attempt to solicit and receive, any remuneration, that is, kickbacks and
bribes, directly and indirectly, overtly and covertly, in cash and in kind,
including by check, in return for referring an individual to a laboratory for the
furnishing and arranging for the furnishing of genetic testing for which
payment may be made in whole and in part by Medicare as set forth below:

| Count | Approximate Date of Kickback Payment | Approximate Kickback Amount |
|-------|--------------------------------------|-----------------------------|
| SIX | November 30, 2018 | $8,000 |
| SEVEN | December 21, 2018 | $4,500 |
| EIGHT | December 28, 2018 | $6,000 |

In violation of 42 U.S.C. § 1320-a7b(b)(1)(A) and 18 U.S.C. § 2.

## FORFEITURE

1.     The allegations contained in Counts One through Eight are incorporated by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 982(a)(7).

2.     Upon conviction of the violation of 18 U.S.C. §§ 371, 1347, 1349, and 42 U.S.C. § 1320a-7b(b)(1)(A), the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

3.     The property to be forfeited includes, but is not limited to, the following: $194,473.10, which represents the proceeds of the offense.

4.     If any of the property described above, as a result of any act or omission

of the defendant:

     a.     cannot be located upon the exercise of due diligence;

     b.      has been transferred or sold to, or deposited with, a third party;

     c.      has been placed beyond the jurisdiction of the Court;

     d.      has been substantially diminished in value; or

     e.      has been commingled with other property which cannot be

         divided without difficulty;

the United States shall be entitled to forfeiture of substitute property under the

provisions of 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).


A TRUE BILL,


FOREPERSON


MARIA CHAPA LOPEZ
United States Attorney

By: _____
Roger B. Handberg
Assistant United States Attorney
Chief, Orlando Division


By: _____
Allan J. Medina
Acting Deputy Chief
Criminal Division, Fraud Section
U.S. Department of Justice


By: _____
Alejandro J. Salicrup
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice

# UNITED STATES DISTRICT COURT
## Middle District of Florida
### Orlando Division

## THE UNITED STATES OF AMERICA

vs.

## IVAN ANDRE SCOTT

## INDICTMENT

Violations:   18 U.S.C. § 371
18 U.S.C. § 1349
18 U.S.C. § 1347
42 U.S.C. § 1320a-7b(b)(1)(A)

A true bill,

_____
Foreperson

Filed in open court this 23rd day

of September, 2019.

_____
Clerk

Bail $_____